GRIFFIS, P.J.,
for the Court:
¶ 1. David Campbell was convicted of fondling a minor over whom he held a position of trust or authority under Mississippi Code Annotated section 97-5-23(2) (Rev.2006). On appeal, he claims: (1) there is no evidence that he occupied a position of trust or authority over the minor; (2) he was never identified to the jury as the perpetrator of the crime; (3) his age, which was an essential element of the crime, was never proven; (4) the verdict is against the overwhelming weight of the evidence; and (5) the circuit court improperly granted Jury Instruction 9. We agree that the State failed to prove that Campbell occupied a position of trust or authority as defined by section 97-5-23(2). Therefore, Campbell’s conviction and sentence are reversed and rendered. Because we reverse on Campbell’s first assignment of error, the remaining issues need not be addressed.
FACTS
¶ 2. Lauren[1] entered residential treatment at Millcreek of Pontotoc when she was sixteen years old. She was in the legal custody of the Jackson County Department of Human Services (DHS) at the time. Lauren had an extensive history of abuse: she was taken into DHS custody when she was two months old; she was placed with her biological father when she was four years old, and he exposed her to physical and sexual abuse; she was placed with her maternal great-grandparents at age seven; and she moved from family member to family member until age fourteen, when she was again placed in DHS custody.
¶ 3. Kitty Campbell, one of Lauren’s therapists, agreed to let Lauren come and live with her and her husband, David Campbell. Lauren stayed with the Camp-bells for approximately three months. During a vacation to California, Lauren had an argument with the Campbells’ son. When the Campbells pulled the car to the side of the road to address the argument, Lauren got out and started walking down the side of the interstate. When they returned home, Lauren was taken back to Millcreek.
¶4. On September 9, 2006, Campbell went to Millcreek to return some of Lauren’s personal belongings. He brought lunch, and he and Lauren sat outside at a gazebo to eat. A group of food-service employees were also outside. They observed Lauren touch Campbell’s face and sit very close to Campbell, acting more like Campbell’s girlfriend than his daughter.
¶ 5. Lauren and Campbell then moved to Campbell’s vehicle, which was backed into a parking space in the Millcreek parking lot. They went to the back of the vehicle. Witnesses testified that Campbell and Lauren sat on the tailgate and lifted their feet into the vehicle. They also said that traffic on the road that faced the back of the vehicle came to a crawl to stare at Campbell and Lauren. The witnesses assumed that Campbell and Lauren were engaged in oral sex, but none could say that they actually saw that behavior. Several of the witnesses testified that they saw Lauren and Campbell kiss, but when cross-examined, they admitted that they just saw Lauren’s and Campbell’s heads come together and assumed that they were kissing.
*60 ¶ 6. The food-services employees reported their suspicions to Millcreek, and Campbell was told to leave. Lauren was questioned by her therapist, Leslie May, about the incident. Lauren denied that any inappropriate behavior had occurred. May questioned Campbell, who also denied that anything inappropriate had happened. Millcreek ordered that a rape kit be administered, which came back negative with no signs of penetration of Lauren’s vagina.
¶7. Lauren made several more denials before she reported that she and Campbell had been in a relationship in which he had kissed, fondled, and had intercourse with her. Lauren testified at trial that she had consensual intercourse with Campbell almost every day. A friend of Lauren’s testified that, while she was spending the night with Lauren at the Campbells’ home, she saw Lauren and Campbell share a passionate kiss. She testified that she waited outside while Campbell and Lauren had sex. When she went back to Lauren’s room, she saw what appeared to be semen on Lauren’s leg. She assumed the semen was Campbell’s because he had just left the room and because Lauren told her that it was Campbell’s.
¶ 8. Campbell was charged with Count I, sexual battery of a minor under Mississippi Code Annotated section 97-3-95 (Rev. 2006), and Count II, fondling of a minor under section 97-5-23(2). The jury found him not guilty of sexual battery but guilty of fondling. Campbell was sentenced to seven years in the custody of the Mississippi Department of Corrections, with two years to serve, five years suspended, and two years of post-release supervision.
ANALYSIS
¶ 9. Campbell claims that there was insufficient evidence to support his conviction of fondling because the State failed to prove that he held a position of trust or authority over Lauren. Therefore, he states that the circuit judge erred by not granting his motion for a directed verdict.
¶ 10. When reviewing a motion for a directed verdict, this Court looks to the sufficiency of the evidence. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). When reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to the State to determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id.
¶ 11. The fondling statute is divided into two parts. Under subsection one, the minor victim must be under the age of sixteen. Since Lauren was sixteen at the time she lived with the Campbells, Campbell was charged under subsection two, which states the following:
Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child younger than himself or herself and under the age of eighteen (18) years who is not such person’s spouse, with or without the child’s consent, when the person occupies a position of trust or authority over the child shall be guilty of a felony and, upon conviction thereof, shall be fined in a sum not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars ($5,000.00), or be committed to the custody of the State Department of Corrections not less than two (2) years nor more than fifteen (15) years, or be punished by both such fine and imprisonment, at the discretion of the court. A person in a position of trust or authority over a child includes without limitation a child’s teacher, counselor, physician, psychiatrist, psychologist, *61 minister, priest, physical therapist, chiropractor, legal guardian, parent, stepparent, aunt, uncle, scout leader or coach.
Miss.Code Ann. § 97-5-23(2). Thus, when the child is between sixteen and eighteen years old, the State must prove the additional element that the defendant occupied a position of trust or authority over the child.
¶ 12. The indictment alleged that Campbell “was in a position of trust and authority over the victim, to wit: the child’s foster parent.” While it seems that foster parent would easily fit into the category of a person in a position of trust or authority, the State failed to prove that Campbell was, indeed, Lauren’s foster parent.
¶ 13. Gloria McArthur, the DHS worker assigned to Lauren’s case, testified that Lauren’s legal custody was held by Jackson County DHS and that her physical custody was at Millcreek. McArthur testified that Lauren was placed with the Campbells; however, on cross-examination, she admitted the following:
Q: What was ... the Cambell[s’] relationship with [Lauren], what were their titles?
A: They were in the process of being approved as foster parents.
Q: But one thing we know they were not foster parents; correct?
A: I can’t remember. I don’t remember seeing the paperwork come through that they were.
Q: Because in order to become a foster parent you have to go through certain hoops, in other words, requirements?
A: Correct.
Q: And one of those requirements is the [paperwork] and orders that designate them as foster parents; correct?
A: They must be licensed.
Q: You have never seen that paperwork have you?
A: We have — like each foster parent that [has] gone through the system we have licensed.
Q: I understand they have to be licensed to be a foster parent; correct?
A; Correct.
Q: Did you ever see the Campbell[s’] license?
A: We did not.
¶ 14. Throughout the trial, the State made reference to the Campbells as Lauren’s foster parents, but it failed to put on any evidence to prove that fact other than McArthur’s testimony that the Campbells were in the process of becoming foster parents. Even on redirect, McArthur’s explanation fell short of proof that the Campbells were foster parents. She stated:
By Mrs. Campbell being [Lauren’s] counselor and she was talking back and forth constantly between my supervisor Matt Matthews and myself. So my supervisor Matt decided that since she was a counselor at Millcreek while going through the process of becoming [a] licensed foster parent that it would be okay for [Lauren] to visit, to, you know, just be treated as one of their own children until we can get the finalization of her placement with them. So they had physical custody of [Lauren].
(Emphasis added).
¶ 15. As Campbell points out in his brief, of the sixteen named relationships in section 97-5-23(2), ten of those are licensed by a government agency-teacher, counselor, physician, psychiatrist, psychologist, minister, priest, physical therapist, *62 chiropractor, and legal guardian. Four involve either a birth certificate or marriage licence — parent, stepparent, aunt, and uncle. And the last two — scout leader or coach — are roles that generally require certification from an organization such as the Boy Scouts of America, the Girl Scouts of the USA, the Mississippi Soccer Association, etc. Again, had the State proven that Campbell was a licensed foster parent, his status would have undoubtably fallen neatly into this list of relationships involving trust or authority over a child.
¶ 16. It is undisputed that, at all times, Lauren was in the legal custody of DHS. While the State says in its brief that Lauren was in the physical custody of the Campbells, the evidence shows that Lauren’s physical custody remained with Mill-creek. The State argues that Lauren was the de facto foster child of the Campbells. It supports this argument largely by Lauren’s testimony that she believed Campbell was her foster father. Even viewing the evidence in favor of the State, we do not agree that Lauren’s subjective belief, which was contrary to the other evidence, is sufficient credible evidence to prove an essential element of the crime charged.
¶ 17. There is no evidence in the record to support the State’s argument that Campbell was acting as Lauren’s de facto foster parent other than the sole fact that Lauren was staying at his home. Even McArthur, a witness for the State, said that DHS allowed Lauren to visit the Campbells’ home — even though they were not licensed foster parents — because Kitty, Campbell’s wife, was Lauren’s counselor.
¶ 18. In Blackmon v. State, 803 So.2d 1253, 1254 (¶ 1) (Miss.Ct.App.2002), Edward Blackmon was convicted of sexual battery by a person in a position of trust or authority in violation of Mississippi Code Annotated section 97-3-95(2). This statute has the same language as the fondling statute concerning who occupies a position of trust or authority-teacher, counselor, physician, psychiatrist, psychologist, minister, priest, physical therapist, chiropractor, legal guardian, parent, stepparent, aunt, uncle, scout leader, or coach.
¶ 19. Blackmon was the uncle of the minor victim; therefore, he was a member of one of the named classes in the statute. Blackmon, 803 So.2d at 1256 (¶ 14). In his motion for a directed verdict, Blackmon claimed that the State had failed to meet its burden because there was no proof that the victim was under Blackmon’s care and control. Id. at (¶ 13). We stated: “this Court interprets the statute to state that any person in control of the care of the child, including, but not limited to, the named classification of individuals, can be held accountable for this crime.” Id. (emphasis added). However, we went on to hold: “Blackmon, the uncle, was a member of one of the particular classes the statute classifies as in a continuous position of trust and authority, regardless of who is ‘in charge’ of the child.” Id. at (¶ 14).
¶ 20. Blackmon arguably creates a window in which Campbell could be held accountable for this crime, even though he is not in one of the named classes, if there was proof that he was in control of Lauren’s care. But there is no such proof in the record. Instead, the proof shows that DHS had legal custody, and Millcreek had physical custody. Lauren was living with the Campbells while they were in the process of becoming foster parents. There is no proof that Campbell exerted any control over Lauren’s care. The evidence merely shows that the Campbells took Lauren into their home and allowed her to accompany them on family vacations. The State did not put on evidence that Campbell controlled Lauren’s care in any way.
¶ 21. The State did not prove that Campbell was Lauren’s foster parent as *63 alleged in the indictment. Because there is no evidence to support the allegation that Campbell held a position of trust or authority over Lauren, we find the jury could not have found all of the elements of the crime of fondling beyond a reasonable doubt. Accordingly, Campbell’s conviction and sentence are reversed and rendered.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAFAYETTE COUNTY.
LEE, C.J., ISHEE, ROBERTS, RUSSELL AND FAIR, JJ„ CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. MAXWELL, L, CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., AND BARNES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.

. We use a fictitious name to protect the identity of the minor victim.